**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SNAP-ON, INC.,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | **Case No. 09 C 6914** |
| **v.** | ) | |
| | ) | **District Judge Charles P. Kocoras** |
| **ROBERT BOSCH LLC,** | ) | |
| **ROBERT BOSCH GmbH, and** | ) | **Magistrate Judge Daniel G. Martin** |
| **BEISSBARTH GmbH** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Snap-On, Inc. ("Snap-On" or "Plaintiff") has sued Defendants Robert Bosch LLC ("Bosch LLC"), Robert Bosch GmbH ("Bosch GmbH"), and Beissbarth GmbH ("Beissbarth") (collectively "Defendants") for the infringement of various patents Snap-On holds concerning a wheel-alignment system that it manufactures. Plaintiff alleges that Defendants infringed the patents by introducing and selling a competing alignment product known as the FWA 4630 in the United States. Beissbarth and Bosch GmbH, which are both German companies, are referred to collectively herein as "the German Defendants."

On January 16, 2012, Beissbarth and Bosch GmbH filed Motions to Dismiss claims against them for lack of personal jurisdiction. On May 17, 2012, District Judge Charles Kocoras referred the case to Magistrate Judge Morton Denlow for the resolution of discovery matters, including discovery related to the parties' jurisdictional dispute. As described more fully below, Judge Denlow issued an initial order, and jurisdictional discovery proceeded. The case was reassigned to this Court on October 1, 2012 after

Judge Denlow retired from the bench.

The parties disagree on whether the discovery responses the German Defendants provided pursuant to Judge Denlow's order are sufficient, or whether additional discovery is required before District Judge Kocoras can consider the pending Motions to Dismiss. Before this Court are Bosch GmbH's Motion for Protective Order Precluding Additional Personal Jurisdictional Discovery [173] and its Motion for Protective Order to Preclude Expanding Personal Jurisdictional Discovery [184]. Beissbarth is not a party to these motions and has not sought protection from further discovery. The Court allowed Snap-On to file a consolidated response that includes its Request for Jurisdictional Document Discovery [195]. After considering the parties' briefs and exhibits, the Court finds that the first Motion for Protective Order is denied as moot, the second Motion for Protective Order is granted, and Plaintiff's Request is granted in part and denied in part.

## I. <u>Background</u>

Snap-On manufactures and distributes a variety of tools and equipment, including diagnostic devices used to identify problems with wheel alignment. These products are sold in the automotive aftermarket. By the early 1990s, Snap-On began distributing a new form of "vision" or "image" alignment that uses camera modules to target specific portions of a wheel. Snap-On claims that Bosch LLC infringed the patents related to this system by introducing the competing FWA 4630 aligner in the fall of 2009. Bosch LLC is a Delaware corporation with its principal place of business in Broadview, Illinois. The company is part of the world-wide organization known as the Bosch Group. (Doc. 195 at Ex. 11). This group includes the German parent company, Bosch GmbH, which in turn owns 350 subsidiaries in sixty countries, including the German subsidiary Beissbarth. (*Id*.).

The German Defendants concede that Beissbarth manufactures the FWA 4630 in Germany, where Beissbarth first introduced it to the German market as a product called the "Easy 3D." (Doc. 173 at 2). As the Court understands it, Beissbarth sells its image aligner in Europe under the Easy 3D name, but Bosch LLC distributed it in this country as the product at issue in this suit, the FWA 4630. Bosch LLC purchases the FWA 4630 from Beissbarth in Germany and has it shipped to the United States. (*Id*.).

Plaintiff alleges that the German Defendants are not passive parties to the FWA 3640's sale in this country. Plaintiff claims that Bosch GmbH made the decision to introduce the FWA 4630 in the United States and that it has been directly involved in purposeful activities that led to its importation and sale. (Doc. 90 at 7). Plaintiff also claims that Bosch GmbH acquired Beissbarth to further this plan because Beissbarth is experienced in manufacturing diagnostic equipment. Acting together, Bosch GmbH and Beissbarth allegedly designed the FWA 4630 and then worked with Bosch LLC to introduce it to the American market. (*Id*.).

The German Defendants vigorously dispute this allegation. They supported their Motions to Dismiss with four affidavits given by employees of Beissbarth and Bosch GmbH. The affidavits made various fact assertions intended to demonstrate that the German Defendants did not have a sufficient role in selling the FWA 4630 in Illinois or other parts of the United States to give rise to personal jurisdiction. (Doc. 195 at Ex. 1). In response, Snap-On sought discovery to establish whether personal jurisdiction exists over Bosch GmbH and Beissbarth.

District Judge Kocoras held a status hearing on January 19, 2012 and agreed that some jurisdictional discovery was in order. Plaintiff's counsel consented at the hearing to

draft discovery requests and to submit them to the German Defendants so that the parties could narrow the relevant issues. An additional status was held in May 2012, when the parties reported that they could not reach an agreement on the scope of jurisdictional discovery. Counsel for the German Defendants told Judge Kocoras that Snap-On was proposing nineteen document requests as well as a set of interrogatories. (Trans. of 5/17/2012 hearing at 5). Judge Kocoras referred the matter to Judge Denlow, and the parties promptly filed discovery motions and motions for protective orders.

At a June 18, 2012 hearing, Judge Denlow granted all the motions in part and ordered that jurisdictional discovery should be "limited to any contacts by Bosch GmbH and Beissbarth GmbH with the United States regarding the accused product[,] and jurisdictional discovery should initially be limited to interrogatories and request[s] for admission." (Doc. 158). Snap-On subsequently submitted 74 requests for admission and 22 interrogatories to Bosch GmbH, and 75 requests and 24 interrogatories to Beissbarth. The German Defendants responded, and the parties then brought the three motions currently before this Court.

## II. Legal Standard

The question of whether jurisdictional discovery should be allowed in a patent infringement suit is determined under the law of the regional circuit in which the case is filed. *Autogenomics, Inc. v. Oxford Gene Tech. Ltd*., 566 F.3d 1012, 1021-22 (Fed. Cir. 2009). Discovery is permitted in the Seventh Circuit only when a plaintiff first establishes a prima facie case demonstrating that personal jurisdiction exists. *Central States, S.E. and S.W. Areas Pension Fund v. Reimer Express World Corp*., 230 F.3d 934, 946 (7th Cir.

2000).  A plaintiff must also demonstrate that "the factual record is at least ambiguous or unclear on the jurisdictional issue."  *Ticketreserve, Inc. v. viagogo, Inc.*, 656 F. Supp.2d 775, 782 (N.D. Ill. 2009) (citation omitted).

The issue of whether personal jurisdiction exists in this case is a matter for the District Judge to decide.  Yet the standard that guides such an analysis determines the need and the relevance of the documents that Snap-On is seeking.  Unlike the right to discovery, the question of whether a court has personal jurisdiction over a defendant in a patent case is decided under the law of the Federal Circuit.  A three-prong test applies to this analysis.  A court asks whether: (1) the defendant purposefully directed its activities to residents of the forum; (2) the claim arises out of or relates to those activities; and (3) the assertion of personal jurisdiction is reasonable and fair.  *Akro Corp. v. Luker*, 45 F.3d 1541, 1545-46 (Fed. Cir. 1995).  The first two factors correspond to the familiar "minimum contacts" prong of the test set forth in *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945). *Inamed Corp v. Kuzmak*, 249 F.3d 1356, 1360 (Fed. Cir. 2001).

With the exception of two Bosch GmbH employees who attended a meeting in Illinois, Snap-On does not claim in its response that the German Defendants had meaningful contacts with this State.  However, physical contact with the forum is not necessary.  A plaintiff can show minimal contacts by demonstrating that a defendant has delivered its products into the stream of commerce with an expectation that they will reach the forum.  *Nuance Comm., Inc. v. Abbyy Software House*, 626 F.3d 1222, 1233 (Fed. Cir. 2010).  Thus, even when a foreign manufacturer has no assets, employees, or direct sales in a forum, a court can still exercise personal jurisdiction over it when the defendant

purposefully ships products through a distributor with the expectation that they will be sold in the forum. *See Beverley Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1565-67 (Fed. Cir. 1994); *Nuance Comm.*, 626 F.3d at 1233-34.

## III. Discussion

Both Snap-On and the German Defendants devote a considerable portion of their arguments to disputing what District Judge Kocoras and Judge Denlow have stated concerning the scope of discovery.[1]  Snap-On argues that neither judge disallowed document requests completely.  The German Defendants claim that both judges' prior rulings preclude all forms of discovery other than interrogatories and requests for admission.

The Court disagrees with the German Defendants' view of the record.  Judge Kocoras stated at the January 19, 2012 hearing that document production might be one means of addressing the jurisdictional issue. He noted that he was "fairly well married to the idea of interrogatories" instead of depositions or document requests in light of the parties' tendency "to ask for the sun, moon, and stars."  (Trans. of 1/19/2012 hearing at 23-24).  However, Judge Kocoras did not rule out the possibility of future document requests altogether.  He only stated that document production should not be considered "unless and

---

[1]  The parties have also taken many opportunities to cast aspersions on the other side's credibility and good faith.  The German Defendants inform the Court that Snap-On's arguments involve "bluster[ing]," "crowing," and "nonsense" that only amount to a "table-pounding verbal tantrum."  (Doc. 196 at 4, 6, 10).  Snap-On describes the German Defendants' affidavits and arguments as "deliberately evasive" and "specious," (Doc. 195 at 9, 13), and claims that their discovery responses involve "absurdity" and "gamesmanship."  (Doc. 197 at 8, 9).  At best, such language is a detriment to resolving the issues at hand.  The Court welcomes vigorous advocacy, but it trusts that the parties' outstanding counsel will refrain from such attacks in future filings.

until there is a basis for me to believe whatever is being relied on, that is being the subject of the document request or being attacked, has a good faith basis behind it." (*Id*.). Judge Denlow's June 18 order is in broad agreement with this position. The order states that discovery should be "initially" limited to interrogatories and requests for admission. (Doc. 158). It did not close off all possibilities of such discovery in the future. (*Id*.).

This Court agrees with the District Judge and Magistrate Judge Denlow that the requests already exchanged were the most appropriate initial means of jurisdictional discovery. For this reason, the Court finds that document production should be considered in this dispute only if answers to the interrogatories and the requests for admission that Judge Denlow permitted have been clearly insufficient.

Snap-On argues that the German Defendants' discovery responses are more than just inadequate. It also claims that they are misleading and intentionally incomplete. If Plaintiff's position is correct, the documents Snap-On seeks may be in order. It is possible, however, that Snap-On has merely received responses that it does not like. The German Defendants contend that they gave Plaintiff what it asked for in the interrogatories, but that Snap-On inadequately framed its discovery requests and is now unhappy with the answers it received. If that is the case, then document production may not be required.

The Court therefore approaches the voluminous record that has been submitted as part of these motions with two guiding inquiries: What has Snap-On already asked for, and what basis exists for finding that the German Defendants have not responded fully and in good faith?

### A.    The First Motion for Protective Order

Bosch GmbH's first Motion for Protective Order asks the Court to protect it from

having to respond further to the interrogatories and requests for admission that Snap-On submitted. Although Snap-On had not filed a motion to compel supplementary responses at the time the motion was filed, Bosch GmbH anticipated that it might do so. The record suggests that Bosch GmbH's concerns were well-founded. The parties disagreed over the scope of discovery in their hearings and correspondence, and they continue to dispute the same topic in these motions.

The issues raised in Bosch GmbH's motion are now moot. Plaintiff states in its response brief that it is no longer seeking any supplementation to its previous discovery and "will not waste time examining the denials" that the German Defendants gave to the requests for admission. (Doc. 195 at 10 and n.2). Snap-On also claims that further litigation over the discovery responses the German Defendants have provided will not resolve the issue of personal jurisdiction. (*Id*. at 18).

Snap-On's reasons for this position are not entirely clear. The interrogatories and requests for admission cover a wide range of activities that are relevant to establishing personal jurisdiction. Snap-On must have believed that answers to these requests would give it the information it needs, or it would not have submitted the interrogatories that Judge Denlow permitted. The most direct way of obtaining complete discovery answers would have been to file a motion to compel. The Court notes in this regard that the German Defendants' responses rely on detailed objections that go far beyond the usual boilerplate variety. Snap-On could have challenged these objections and tried to seek supplemental answers that were not limited by them. Instead, Plaintiff claims that it has no recourse at this point but to ask for the document production that both District Judge Kocoras and Judge Denlow have discouraged.

The Court expresses no opinion on the merits of the German Defendants' objections. But by failing to address either them or the discovery answers head on in a motion to compel, Snap-On has abandoned the field concerning any supplementation to its earlier discovery requests. The Court accepts Snap-On's withdrawal of all objections to the German Defendants' discovery answers and finds that no further response to the interrogatories and requests for admission is necessary. As a result, the first Motion for Protective Order is denied as moot.

### B.    The Second Motion for Protective Order and Plaintiff's Request

On October 31, 2012, Bosch GmbH filed its second Motion for Protective Order to head off any document request by Plaintiff. As before, Snap-On had not formally sought documents from Bosch GmbH when the motion was filed, but Bosch anticipated that Plaintiff would do so. The Court held a hearing on November 16, 2012 on these issues and allowed Snap-On to include a motion for document production in its response to the German Defendants' protective motions. In order to bring this long-standing dispute to a close, the Court suspended the page limitations on the parties' briefs so that they could state their positions in full.

Bosch GmbH first claims that it should be protected from producing documents because Plaintiff has failed to show a prima facie case of personal jurisdiction and has not demonstrated why the record is unclear or ambiguous on the jurisdictional issue. As noted earlier, these conditions must be present before discovery is allowed to begin on personal jurisdiction. *Central States*, 230 F.3d at 946; *Ticketreserve*, 656 F. Supp.2d at 782. However, District Judge Kocoras and Judge Denlow have already given Snap-On leave to begin jurisdictional discovery, and the Court presumes that they would not have done

so had they not found that these two preconditions to initiating discovery were met. The only relevant question at this stage is whether additional discovery is warranted.

Bosch GmbH argues that further discovery is not permissible because foreign parties like itself should not be subjected to extensive discovery on personal jurisdiction. In principle, Bosch GmbH is correct. Courts must exercise caution both in the scope of jurisdictional discovery and the exercise of personal jurisdiction over foreign entities. *See United States v. First Nat. City Bank*, 379 U.S. 378, 404 (1965) (Harlan, J., dissenting) ("Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field."); *Central States*, 230 F.3d at 946 (addressing discovery). That said, the burden on a foreign party must also be weighed against the reasons a plaintiff gives to justify jurisdictional discovery.

Snap-On counters Bosch GmbH's argument by claiming that the burden of production on the German Defendants would not be significant because Plaintiff's document requests are narrowly tailored. Snap-On supports this claim by setting out five categories of documents that it wants the German Defendants to produce. These include:

> 1.      All agendas, notes, meeting minutes, reports, memos, projections or analyses which refer or relate to the introduction or sale of the Accused Product into the U.S. market.
>
> 2.      All communications which refer or relate to the introduction or sale of the Accused Product into the U.S. market.
>
> 3.      All documents and communications relating to the marketing of the Accused Product in the U.S., including but not limited to documents relating to advertising, pricing, sales efforts, market analyses, strategic plans, or sales plans.
>
> 4.      All documents relating to the shipment or importation of the Accused Product or any component of the Accused Product into the U.S., regardless of whether Bosch GmbH or Beissbarth claim [sic] to have been the entity

shipping or importing the Accused Product.

5.      All documents related to the sale or transfer of the Accused Product
from either Beissbarth or Robert Bosch GmbH to Robert Bosch LLC,
including but not limited to any related contracts or agreements, invoices,
records of payment, [or] any negotiations over the terms of sale or transfer.

(Doc. 195 at 2-3).

The Court disagrees that producing documents on these topics would not impose

significant burdens on the German Defendants.  The proposed requests are wide ranging

in nature and encompass virtually all aspects of the German Defendants' alleged roles in

introducing the FWA 4630 product into the stream of commerce.  As noted above, the

Court will allow these or similar requests only if Snap-On can show that the German

Defendants' earlier interrogatory responses were intentionally misleading or incomplete.

This is in keeping with Snap-On's principal complaint that the discovery responses it

received are "deliberately evasive on key facts pertinent to this Court's jurisdiction."  (Doc.

195 at 9).

Snap-On supports this claim by arguing that the documents it received from Bosch

LLC show that the German Defendants failed to respond accurately in four categories: (1)

the extent of the German Defendants' involvement in the decision to introduce the FWA

4630, (2) the role they played in shipping the product to the United States, (3) the terms

of the FWA 4630's transfer between Bosch LLC and the German Defendants, and (4) the

role played by the German Defendants in marketing the aligner in the United States.  The

Court addresses each of these categories in turn.[2]

_____

        [2]   Plaintiff cites only a small portion of the large record it has submitted.  The
German Defendants refer to even less of it.  The Court has reviewed the record in its
entirety, but the Court will not address any document that the parties have not specifically

## 1.    The Product's Introduction to the United States

Interrogatory No. 1 asked Beissbarth and Bosch GmbH to describe their activities in introducing the FWA 4630 to the American market, including a description of the German Defendants' roles in marketing and pricing the aligner. Both defendants answered "none" but provided an explanation to support that response. Bosch GmbH stated that it participated in business reviews of Bosch LLC's Diagnostic Unit and received periodic marketing reports. Bosch GmbH then compiled the reports it received to form a "product roadmap" for the FWA 4630. (Doc. 195, Ex. 15A at 9).

Beissbarth responded to Interrogatory No. 1 in considerable detail. Beissbarth claimed that Bosch LLC approached it about purchasing the Easy 3D product, which Bosch LLC relabeled as the FWA 4630. The parties negotiated a purchase price at arms length in Munich, and Bosch LLC arranged for the product's shipment to America. Beissbarth has provided some technical support to Bosch LLC, but it did not modify the product for the American market. Beissbarth also made available to Bosch LLC the marketing plans it had used to promote the Easy 3D in Europe, and Bosch LLC tailored those plans to market the FWA 4630 in the United States. In Interrogatory No. 2, Beissbarth also stated that two employees, Tobias Wirbser and Witold Janus, traveled to Ashland, Virginia to provide technical training on the FWA 4630. (*Id*., Ex. 15B at 9-12).

Snap-On disputes these explanations and claims that both Bosch GmbH and Beissbarth were involved in high-level planning and coordination of the FWA 4630's

---

relied on in their briefs. *See Lemmermann v. Blue Cross Blue Shield of Wis.*, 713 F. Supp.2d 791, 803 n.12 (E.D. Wis. 2010) (stating that a court is not required "to engage in an archeological dig to find whatever excerpt it needs at any given time").

introduction to the United States. Plaintiff first points, without explanation, to what appears to be a project chart for three phases of testing and launching the FWA 4630. (Bosch00001892). The template has "Robert Bosch GmbH" stamped on the bottom, but it does not provide any information from which the Court can infer that either of the German Defendants was directly involved in planning the aligner's introduction to the American market. Snap-On has not explained why this chart is not accounted for by Bosch GmbH's response that it compiled a roadmap for the FWA 4630 that included "product launch dates."[3] (Doc. 195, Ex. 15A at 9).

Plaintiff also refers the Court to minute notes from a meeting that took place in late September and early October 2009 in Ashland, Virginia. (Bosch00012520-12524). The meeting was attended by Beissbarth employee Richard Wagner. Snap-On claims that these documents show that the German Defendants were involved in multiple planning meetings and that the American launch of the FWA 4630 was the main topic of discussion at them. According to Plaintiff, the German Defendants should be required to produce documents related to planning and coordinating the FWA 4630's launch in this country because they intentionally failed to identify their presence at the March 2009 meeting.

The Court disagrees with this conclusion. The documents in Bosch00012520-12524 appear to cover separate discussion sessions at one meeting, not multiple meetings that the German Defendants have tried to hide. Moreover, it is far from clear that the FWA 4630 was the main topic, as Snap-On claims, because the meeting notes refer to a wide

---

[3]    Plaintiff also cites an August 11, 2009 email that was produced as Bosch00010535. This document is discussed more fully below as part of terms of sale between Beissbarth and Bosch LLC. Snap-On does not provide any discussion of the document to support its argument here.

range of issues. It is true that neither of the German Defendants identified the October 2009 meeting specifically, but they both referenced other meetings with Bosch LLC. Bosch GmbH stated that various of its employees may have attended four similar meetings, and Beissbarth identified two meetings that some of its employees attended in order to provide technical support and training. Bosch GmbH's amended response to Interrogatory No. 2 explained that these meetings were hosted by Bosch LLC in order to assess how the overall division was operating as a business unit. (Doc. 195, Ex. 15A at 10).

The German Defendants may have overlooked the October 2009 meeting, but that is not the same as an intentional withholding of facts in order to mislead the opposing party. Thus, the Court does not find that the failure to identify the 2009 meeting shows that the German Defendants intended to mislead Plaintiff or that their oversight rises to a level that would justify the document production Snap-On is seeking. Plaintiff's request for document discovery on this topic is denied.

## 2.    The Product's Shipment to the United States

Snap-On's Interrogatory No. 3 to Beissbarth asked it to identify each entity that imports or sells the FWA 4630 aligner into this country. Interrogatory No. 5 expanded on this request by demanding that Beissbarth identify the number of items sold to Bosch LLC, together with detailed supporting information.[4] Beissbarth responded that it does not sell or import the accused product to the United States. To date, it has sold 135 units to Bosch LLC, which takes delivery of them in Munich, Germany. Beissbarth further stated that it

---

[4] The Court does not consider any argument concerning Bosch GmbH's alleged failure to respond fully to these interrogatories because Snap-On's response does not include that company's answers to Interrogatories Nos. 3 and 5.

was unaware of when Bosch LLC arranges to have the aligners imported to the United States. Beissbarth's answer to Interrogatory No. 1 also explained that the company creates an invoice for each aligner it sells, and Bosch LLC takes possession of the product at Beissbarth's Munich location.

Snap-On takes issue with this response by suggesting that Beissbarth itself played some role in shipping the FWA 4630. As evidence, Plaintiff first points to a March 9, 2009 invoice that was submitted as Bosch00006985. The invoice identifies fifteen products that were shipped from Beissbarth's Munich facility, which is listed as the "shipping point" for the FWA 4630. However, reliance on this invoice is misplaced as a means of showing any direct involvement by Beissbarth. Snap-On overlooks that Beissbarth answered Interrogatory No. 1 by stating that its invoices always identified its Munich address as the "shipping point" because that is where Bosch LLC takes possession of the FWA 4630. Snap-On has not explained why Bosch00006985 contradicts any part of this response.

Snap-On has raised a more serious concern about the role Beissbarth claims to play in the product's actual shipping. Beissbarth stated in Interrogatory No. 1 that Bosch LLC arranges for the aligner's shipment by designating an agent and a carrier to take possession of the FWA 4630 at Beissbarth's facility and to ship it to Bosch LLC's American location. Snap-On disputes this description by citing several documents that suggest Beissbarth may have played a more active role. The first involves two project charts stating that Beissbarth was the party responsible for shipping at least one aligner from Munich to Virginia. (Bosch0001893 and Bosch00026862). The second is a March 2009 project chart noting that Ricardo Chueca, Beissbarth's Regional Marketing and Sales Manager, was designated to "process [a FWA 4630] order to ship air freight."

15

(Bosch00003653-3654). Finally, Plaintiff notes that a March 31, 2009 email from Bosch LLC employee Jeff Hoffman instructed Chueca to "ship [the aligner] quickest air freight." Bosch00008317-8320).

These internal communications between companies in the Bosch Group are short, and their full implications are not self-evident. But they do suggest that Beissbarth played some role in the FWA 4630's shipment other than merely handing over the aligner to a third-party agent who acted for Bosch LLC. Unfortunately, the German Defendants have failed to address these documents or to provide any explanation of why they do not mean what Plaintiff claims. The Court lifted the page limitations on the parties' briefs to give both sides the opportunity to state their case in full and to bring this ongoing dispute to an end. If Beissbarth believed that the emails and project notes cited above do not contradict its interrogatory responses, it was obligated to explain why that is the case. However, it has chosen not to do so.

Without any guidance from Beissbarth, the Court finds that Snap-On has shown that document production is appropriate on the limited issue of Beissbarth's role in shipping the FWA 4630 from Munich to Virginia.[5] This does not mean that Beissbarth must respond to any of the five document requests quoted earlier. Those requests are overly-broad and burdensome. Instead, Beissbarth is directed to produce all documents it has that relate to any action Beissbarth, its employees, or its agents took on behalf of Bosch LLC in

_____

[5] The German Defendants claim that any document production would only duplicate what Bosch LLC has already provided to Snap-On, (Doc. 196 at 20), but they provide no evidence to support that claim. The German Defendants point to some of Snap-On's document requests to Bosch LLC, but they fail to explain what Bosch LLC produced or what that company's production would be the same as what Beissbarth is required to produce here.

shipping the FWA 4630 from Munich to the United States.  Plaintiff's Request is granted on this issue.

### 3.    The Terms of Sale

Snap-On next argues that it is entitled to documents concerning the terms negotiated between Bosch LLC and the German Defendants for the aligner's transfer between the parties.  In support, Plaintiff points to five of its interrogatories, including Interrogatory No. 2 discussed earlier.  Interrogatory No. 5 asked Beissbarth to identify the number of units sold, together with the date, price, and profit margin involved.  Beissbarth responded that it sold 135 units at a price of $15,444 each.  Beissbarth also stated that the terms of this price structure were negotiated at arms length at a meeting in Munich.  Payment was due on the 15th of each month.

Interrogatories Nos. 14 and 15 asked Beissbarth to identify the negotiations between itself and Bosch LLC and to describe how the terms offered to Bosch LLC differed from those offered to other purchasers of the image aligner.  Beissbarth answered that each customer, including Bosch LLC and non-Bosch customers, received individually-negotiated prices for the FWA 4630.  Some customers pay a lower price for the product than Bosch LLC pays.

Snap-On claims that three documents show, at least in part, that the FWA 4630's price was negotiated outside of Munich and that the negotiation was not conducted at arms length, as Beissbarth claims.  The most substantial of these is Bosch00010535.  This document is an email from Bosch LLC's account manager, Steve Jordan, to various persons that included Beissbarth employees Ulrich Thiele and Ricardo Chueca.  The email contains brief summaries of an earlier telephone conference and states:

17

We discussed the financial approach we are taking with the products. The decision was made to launch the product with a negative profit outlook, given current assumptions. In summary, Beissbarth and Bosch NA controllers will work together to understand the EASY3D market price, COGs, and profit structures to identify impactful areas for cost reduction. The controllers will work with Ulrich Thiele to move forward and achieve acceptable profits, while considering each business unit and Bosch Diagnostics as a whole.

(Doc. 195 at Ex. 4).

Snap-On has not made any showing of why this email suggests that Beissbarth's discovery responses on the transfer terms are misleading. The interrogatories Plaintiff points to only involve how Beissbarth and Bosch LLC negotiated the product's intra-company price between themselves. By contrast, this email refers to Bosch LLC's later sale of the product it had already bought from Beissbarth in the retail aftermarket. As far as the Court can tell, Bosch00010535 involves a different market in a separate country from where the FWA 4630 was sold to Bosch LLC. The only relevant issue here is whether Beissbarth actually negotiated the original terms of the sale at arms length, not the FWA 4630's aftermarket price.

Moreover, the cited excerpt specifically refers to the "Easy 3D" aligner that was sold in Europe, not the FWA 4630 sold in America. The Court notes that "Easy 3D" and "FWA 4630" are distinguished from one another in other parts of the email and do not appear to be used as synonyms for the American aligner. Beissbarth answered Interrogatory No. 12 by stating that it helped Bosch LLC on one occasion to increase the FWA 4630's American sales in light of Beissbarth's prior experience with the Easy 3D product in Europe. One reasonable interpretation of Bosch00010535 is that it refers to this event that Beissbarth identified rather than to a coordinated plan to maximize the Bosch Group's world-wide profitability.

Snap-On also relies on an August 28, 2009 email from Beissbarth employee Richard Wagner to a person named James Frazer. (Bosch00003460). The email is far from clear, but Wagner stated that "prices had to increase" and that "the whole Bosch world understood the necessity of the price harmonization and price increase." Snap-On's only argument concerning this document is that it illustrates the inadequacy of Beissbarth's interogatory answers by proving that prices were discussed via email.

Even assuming the email means what Plaintiff claims, it falls far short of showing that Beissbarth's interrogatory answers are misleading. Beissbarth never claimed that prices for the FWA 4630 were only "discussed" in Munich; it stated that the original purchase price between itself and Bosch LLC was negotiated there. Bosch00003450 does not contradict that statement. The email refers to changes in pricing, but Beissbarth's response to Interrogatory No. 5 admitted that the sales price has varied since the original cost of $15,444 was negotiated in Germany.

Snap-On's final document involves Bosch00012521, which contains minute notes from an October 2009 meeting in Ashland, Virginia that was attended by Richard Wagner. Snap-On highlights an entry titled "Pricing Structure, Equipment, Accessories, and Parts for 2010." The notes for this section state that Beissbarth was using a "new discount structure" and that Richard Wagner presented some information on Beissbarth's "current transfer pricing." An increase in the FWA 4630's price appears to have been discussed because the notes state: "Pricing increase for January 2010, average 1.2% increase."

Plaintiff again fails to explain the meaning of the document it cites, stating only that it shows that the topic of prices was discussed in the United States. As before, that does not contradict any of Beissbarth's responses. Beissbarth did not deny that prices were

discussed outside of Munich. It only claimed that it negotiated the original purchase price there. The October 2009 meeting notes do not state that new prices were negotiated in the United States. Instead, it refers to a "new discount structure" that appears to have already been established at the time of the meeting. Insofar as Snap-On relies on the fact that prices for the FWA 4630 fluctuated, Beissbarth answered Interrogatory No. 5 by conceding that the product's price "varied over time due to additional rebates and discounts negotiated." (Doc. 195, Ex. 15B at 15).

In the absence of any meaningful discussion by Snap-On of the documents it cites, the Court declines to find that Plaintiff has shown that Beissbarth intentionally misled it on the terms of transfer between Beissbarth and Bosch LLC. Plaintiff's Request is denied on this issue.[6]

### 4. The United States Marketing Plan

Finally, Snap-On disputes the German Defendants' responses to Interrogatory No. 12. That request asked both Beissbarth and Bosch GmbH to identify meetings or communications they had with Bosch LLC "regarding marketing and/or increasing sales" of the FWA 4630 in the United States. Bosch GmbH responded that it participated in business reviews of Bosch LLC as one of its subsidiary companies, and also reviewed progress and marketing reports. (Doc. 195, Ex. 15A at 15-16). Beissbarth stated that it did

---

[6] Snap-On has not shown why Bosch GmbH's discovery responses on the transfer issue were misleading. Plaintiff cites Interrogatory No. 5, but Snap-On did not provide Bosch GmbH's response to that interrogatory in its exhibits. Plaintiff also cites Interrogatory No 13, which asked Bosch GmbH to identify "any terms offered to Bosch LLC that are different than the terms offered to other entities." (Doc. 195, Ex. 15A at 16). Snap-On has not proffered any evidence suggesting that Bosch GmbH was involved in the price Beissbarth charged any of its customers for the FWA 4630. Plaintiff's Request is denied as it relates to Bosch GmbH.

not play any role in marketing the aligner, though it marketed the Easy 3D in Europe. However, Beissbarth stated that it did provide some information to Bosch LLC on how it had increased the Easy 3D's European sales. (*Id*. at Ex. 15B at 24-25).

Snap-On claims that two emails refute these responses. Bosch00016253 is an email from David Scribner, a Group Manager with Bosch LLC, to three individuals who are not identified by Plaintiff. The email states: "As soon as possible, we need to get on the same page with Beissbarth to determine our marketing plan." This document only indicates that Bosch LLC wanted some marketing guidance from Beissbarth. It says nothing about how Beissbarth responded or what actual role it had in promoting the American sales of the FWA 4630.

The second document, Bosch00020124, is an email from Bosch LLC's employee James Graninger that states: "Here are some Easy 3D selling tips from our friends in Munich." If anything, this email confirms Beissbarth response to Interrogatory No. 12 instead of contradicting it. As noted above, Beissbarth admitted that it provided some information to Bosch LLC on how it had tried to increase sales of the Easy 3D product in Europe. (Doc. 195, Ex. 15B at 24-25).

Snap-On also questions Bosch GmbH's answer to Interrogatory No. 12 by citing Bosch00010654-10656. These documents contain notes from a March 2009 meeting in Broadview, Illinois that was attended by Bosch GmbH employees Faulenbach and Ulrich Thiele. Snap-On highlights two short excerpts from the entries in these documents. The first states somewhat enigmatically: "Competitor comparism [sic] Easy3D with major competitors." The second notes that an unidentified person "presented overview about the current marketing activities, promotions and BSC."

These excerpts fails to show that Snap-On is entitled to document production. The Court notes that Plaintiff has not explained any part of these notes, which are highly abbreviated and relate to a meeting that included seven other persons and many topics of discussion. The fact that two Bosch GmbH employees attended does not mean that Bosch GmbH provided marketing advice on the FWA 4630. In fact, the excerpts that Plaintiff highlights do not indicate which of the nine people at the meeting spoke on any specific topic. The notes do include cryptic entries such as "DGW/MKT" that may be associated with the names of the attendees, but Plaintiff has not explained what these terms mean or how they implicate Bosch GmbH in devising a marketing plan for the FWA 4630. Snap-On's Request is denied on this issue.

## IV. <u>Conclusion</u>

The German Defendants' Motions to Dismiss have now been pending for almost eleventh months while the parties have disputed the nature and scope of personal jurisdiction discovery. The Court recognizes the vital interest both sides have in this matter and does not take it lightly. Notwithstanding, substantial jurisdictional discovery has already been exchanged in the form of interrogatories and requests for admission. Snap-On has also received a large production of documents from Bosch LLC. With the limited exception noted above, the Court finds that Snap-On has not shown why any further discovery is necessary on the issue of personal jurisdiction.

For these reasons, Bosch GmbH's Motion for Protective Order Precluding Additional Personal Jurisdictional Discovery [173] is denied as moot. The second Motion for Protective Order to Preclude Expanding Personal Jurisdictional Discovery [184] is granted. That motion only seeks protection for Bosch GmbH. Snap-On's Request for Jurisdictional

Document Discovery [195] is granted in part and denied in part.

Beissbarth is directed produce documents in its possession, if any, that relate to actions Beissbarth, its employees, or its agents took on behalf of Bosch LLC in shipping the FWA 4630 from Munich to the United States. This shall include any documents that may exist concerning the actions referred to in Bosch0001893, Bosch00026862, Bosch00003653-3654, and Bosch00008317-8320, as discussed above. Beissbarth shall provide these documents to Plaintiff by January 3, 2013. No further discovery concerning the personal jurisdiction issue will be allowed.

**ENTERED:**

_____
**DANIEL G. MARTIN**
**United States Magistrate Judge**

Dated: December 10, 2012