UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SNAP-ON INCORPORATED, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 09 C 6914 |
| | ) |
| ROBERT BOSCH, LLC, ROBERT BOSCH, | ) |
| GmbH, and BEISSBARTH GmbH, | ) |
| | ) |
| Defendants. | ) |

### MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

Now before the Court is Defendant Beissbarth GmbH's ("Beissbarth") motion to dismiss under Federal Rule of Civil Procedure 12(b)(2). For the following reasons Beissbarth's motion is denied.

### BACKGROUND[1]

Snap-On Inc. ("Snap-On") is incorporated under the laws of Delaware with its principal place of business in Kenosha, Wisconsin. On November 3, 2009, Snap-On filed a complaint against Robert Bosch, LLC ("Bosch USA"), alleging that Bosch USA infringed on several of its patents relating to an optical wheel alignment system. On August 18, 2011, Snap-On filed an amended complaint, which added Bosch

---

[1] The Court accepts the uncontested allegations from Snap-On's first amended complaint as true and resolves any factual conflicts in Snap-On's favor. *Elec. For Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1350 (Fed. Cir. 2003).

GmbH and Beissbarth as defendants. Bosch GmbH and Beissbarth are corporations organized under the laws of Germany. Bosch GmbH is comprised of 350 subsidiaries and regional companies, including Beissbarth and Bosch USA.

In October 2007, the manager of Bosch GmbH's Automotive Aftermarket Division Robert Hanser ("Hanser") issued a memorandum entitled "Strategy for the Success and Growth of the Bosch Automotive Aftermarket division." The memorandum stated that "the greatest opportunities in our market lie in the field of diagnostics." In an attempt to reach Bosch GmbH's goal of "developing Bosch Diagnostics as a global player and [t]o become the global market leader," Hanser announced a "significant step forward" to achieving its objective through the acquisition of Beissbarth in 2007. Hanser noted that Beissbarth's "key focus is on chassis and axle alignment as well as brake test stands and test lines." According to Hanser, Beissbarth's acquisition meant a "significant expansion for our product range in the area of non-contact, optical axle alignment technology." Bosch GmbH's 2007 Annual Report recognized the United States as the company's "most important market outside Germany." Beissbarth manufactures the FWA 4630 optical wheel alignment system, also known as the Easy 3D, in Germany. The Easy 3D wheel alignment system was developed by Beissbarth after the company was acquired by Bosch GmbH.

In December 2008, Beissbarth announced a cross-company meeting to discuss the international needs for "wheel aligners and brake testers" to take place the

following month at Beissbarth's Munich, Germany headquarters. Bosch GmbH employee Klaus Michael-Koch instructed several Bosch USA representatives to attend the "international meeting." Bosch USA's David Scribner ("Scribner") attended the meeting.

On February 5, 2009 a meeting was held at Bosch USA's Broadview, Illinois corporate headquarters. Although a Beissbarth representative was not in attendance, the meeting minutes reflect that Beissbarth was working in conjunction with Bosch USA and Bosch GmbH on a detailed project plan for the launch of the Easy 3D. The pricing of the Easy 3D aligner was also discussed in the context of long term and short term profitability. Bosch USA acknowledged that any incurrence of short term losses had to be compensated with the support of Beissbarth.

To coincide with the internal time lines established by Bosch GmbH, testing of the Easy 3D in the United States was to commence in the spring of 2009. In the early stages of the Easy 3D testing, the shipment of the Easy 3D from Munich, Germany (Beissbarth facility) to Ashland, Virginia (Bosch USA facility) was performed by Beissbarth. A May 2009 project goal chart formulated by Bosch GmbH highlighted major project milestones pertaining to the launch of the Easy 3D aligner. Beissbarth's Regional Marketing and Sales Manager for Beissbarth's International Sales Department Ricardo Chueca ("Chueca") was designated as the individual responsible for shipping the Easy 3D test aligner to Bosch USA in March 2009. In a March 31, 2009 email sent from Bosch USA's Scribner to Beissbarth's Chueca, Scribner

informed Chueca that they were running behind schedule on the testing of the Easy 3D aligner. Scribner questioned Chueca about the "status of the urgent air shipment to [Bosch USA's facility in] Ashland."

After the March 2009 shipment of aligner, the transfer pricing of the Easy 3D aligner again came up as an issue. In June 2009, Bosch USA's James Frazer ("Frazer") sent an email to Beissbarth's Richard Wagner ("Wagner"), inquiring about the prospect of lowering the cost of the aligner that Bosch USA had to pay. Wagner responded that the current price Bosch USA was paying for the aligner was "357-[Euros] lower than its minimum price." However Wagner invited Frazer to have a teleconference to determine if compensation for the Easy 3D could be obtained through other Beissbarth products where there may be more of a reserve to cut costs. It was determined that to save on the transfer price between companies Frazer and Wagner discussed future purchases of the Easy 3D aligner being made directly from Beissbarth's Munich factory. Subsequently Beissbarth sold all units to Bosch USA at its Munich factory and Bosch USA was responsible for shipping the aligners to the United States. Beissbarth sent the invoices for the purchases to Bosch USA's Carol Stream, Illinois corporate mailing location.

As the Easy 3D alignment system was prepared for its launch in the United States, technical difficulties necessitated Beissbarth to assist Bosch USA in its resolution. In July 2009, email communications between employees of Bosch USA and Beissbarth indicate that Bosch USA employees were "on line" with three

Beissbarth employees "conducting live tests" on the Easy 3D aligner in Bosch USA's Ashland, Virginia facility. When the performance of the aligner was not satisfactory, Beissbarth technicians attempted to provide technical support for the aligner. After these attempts failed, Beissbarth's Wheel Alignment Product Manager Tobias Wirbser ("Wirbser"), traveled to Ashland to work "side by side" with members of Bosch USA's team in an effort to resolve all technical issues before the fall 2009 launch of the alignment system. Wirbser "provide[d] training on the Easy 3D product to [Bosch USA]." Beissbarth rendered further assistance to Bosch USA by sending Witold Janus, a service technician, to Virginia to assist with the Easy 3D in 2009.

On August 5, 2009 Ulrich Thiele ("Thiele"), the Vice President of Finance and Controlling for Bosch GmbH, emailed representatives from Beissbarth and Bosch USA. Thiele disclosed that the current pricing of the Easy 3D would result in a "continuous loss situation" and if nothing changed the project should be stopped. Thiele instructed Beissbarth's Marco Kempin ("Kempin") and Bosch USA representatives to provide consolidated financial reports concerning the pricing of the alignment system. Following Thiele's instruction, Beissbarth and Bosch USA conducted a detailed financial analysis of the Easy 3D and together set the transfer price.

In an August 11, 2009 e-mail from Bosch USA Senior Account Manager Steve Jordan ("Jordan") to Bosch GmbH and Beissbarth representatives, Jordan highlighted the main points of a previous inter-company conference call, which crystalized the

decision to launch the Easy 3D aligner with a "negative profit outlook." Thereafter the companies would "work together to understand the Easy 3D market price" and collaborate with Thiele to "achieve acceptable profits, while considering Bosch Diagnostics as a whole." Beissbarth was given several tasks in the email concerning forwarding warranty definitions to Bosch USA and providing assurance plans for compliance with NAFTA. On August 14, 2009 Beissbarth's Chueca emailed Bosch GmbH and Bosch USA representatives to inform them that the previously agreed upon transfer price was determined using the wrong discount percentage.

On September 4, 2009 Bosch USA's Scribner emailed Silke Spitzer ("Spitzer") of Beissbarth's Research and Development division to obtain his assistance in translating the Easy 3D performance instructions from German to English. Spitzer provided input on the translation in question and further suggested terms which could be used to ensure the directions were clear. Translations of marketing materials were also the subject of correspondence between Beissbarth and Bosch USA.

The Easy 3D aligner was field tested at eight preselected locations in the United States. A May 2009 Bosch GmbH presentation titled "NAFTA Easy 3D Aligner" laid out time tables for different facets of the alignment project. The presentation highlighted that the field testing was scheduled to begin in February 2009 and was to conclude in September 2009. Four of the eight testing locations were located in Illinois and the remaining four locations were in Virginia. The Easy 3D testing locations in Illinois were described as performing a high volume of sales

and/or automotive repair work. In September 2009, as the field tests were being performed, technicians in both Illinois and Virginia encountered system errors with the aligner which inhibited the Easy 3D's performance. Bosch USA's Scribner expressed concern in an email carbon copied to Beissbarth's Wagner that testing errors may "become problematic now that we are into the product release stages of the product launch." Scribner also highlighted that the testing at the Arlington Heights, Illinois location would be subject to scrutiny as "this is [a] location where the competition will likely visit the installation to learn about the system." To resolve the testing errors Bosch USA representatives relied on Beissbarth's Product Manager for Wheel Alignment Wirbser to offer solutions to the problems, which were eventually remedied.

Several weeks prior to Bosch USA's launch of the Easy 3D aligner, Beissbarth's Wagner traveled to Bosch USA's facility in Virginia to attend a three day meeting focused on the launch of the Easy 3D aligner. After the conclusion of the meeting Bosch USA's Jordan sent an email to Wagner on October 5, 2009 summarizing the topics discussed. The meeting notes indicate that Bosch USA's Scribner was tasked with providing part numbers needed by Bosch USA from which Beissbarth's Wagner would provide the requisite information and descriptions. In the Warranty section of the meeting notes, Beissbarth was required to provide part numbers and pricing for any exchanged products. Under the NAFTA section of the meeting notes it was emphasized that Bosch USA and Beissbarth would work as a

team in North America. Beissbarth would "assist with [a] business model to accommodate unique conditions of North America." Beissbarth's "Wagner wants to understand [the] nuances of the North American [m]arket." Further under the Market Trends and Competitive Equipment Review subsection, Bosch USA was to provide marketing inputs through more interactions with Beissbarth in product planning and development. In November 2009 the Easy 3D Wheel Alignment system was launched in the United States by Bosch USA.

On April 12, 2010 Beissbarth's Wagner emailed Bosch USA's James Graninger ("Graninger") congratulating him on the sale of one hundred Easy 3D alignment systems. Wagner then offered to help Graninger exceed Bosch USA's forecast by 50%. Subsequently, Graninger accepted Wagner's offer of assistance and inquired about sales methods that Beissbarth used which yielded positive results. On April 14, 2010 Wagner offered Graninger sales advice encouraging "live demonstrations directly in the workshop of the targeted customer." The same day Graninger emailed several members of his Bosch USA team to forward them "some Easy 3D selling tips from our friends in Munich [Beissbarth]."

On August 18, 2011, Snap-On filed an amended complaint adding Bosch GmbH and Beissbarth as defendants. On January 16, 2012, Beissbarth filed a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). On June 18, 2012 Magistrate Judge Morton Denlow allowed for the parties

to conduct limited jurisdictional discovery which closed in December 2012. The parties have completed briefing, and the issues are ripe for decision.

## LEGAL STANDARD

Whether a court has personal jurisdiction over a defendant in a patent case is determined according to the law of the Federal Circuit rather than of the regional circuit in which the case arose because jurisdictional questions are "'intimately involved with the substance of the patent laws.'" *Avocent Huntsville Corp. v. Aten Int'l Co.*, 552 F.3d 1324, 1328 (Fed. Cir. 2008) (quoting *Akro Corp. v. Luker,* 45 F.3d 1541, 1543 (Fed. Cir. 1995)). When a defendant challenges the court's exercise of personal jurisdiction, the plaintiff bears the burden of demonstrating that personal jurisdiction exists. *Merial Ltd. v. Cipla Ltd,* 681 F.3d 1283, 1294 (Fed. Cir. 2012). When jurisdictional discovery has been exchanged by the parties, without the occurrence of an evidentiary hearing, the plaintiff must make a prima facie showing that the defendants are subject to personal jurisdiction. *Coyle,* 340 F.3d at 1349; *AFTG-TG, LLC v. Nuvoton Technology Corp.*, 689 F.3d 1358, 1360 (Fed. Cir. 2012) (when a district court relies on written submissions from the parties without holding an evidentiary hearing, the plaintiffs are required to allege a prima facie showing of personal jurisdiction).

**DISCUSSION**

Snap-On asserts that exercising jurisdiction over Beissbarth is proper under Rule 4(k)(2). Beissbarth contends that it does not have the requisite minimum contacts in the United States to be subject to the Court's jurisdiction. Rule 4(k)(2) was adopted to provide a forum for federal claims in situations where a foreign defendant lacks substantial contacts with any single state but has sufficient contacts with the United States as a whole to satisfy due process standards and justify the application of federal law. *Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com de Equip. Medico,* 563 F.3d 1285, 1295-96 (Fed. Cir. 2009) (citing advisory committee notes to the 1993 amendment establishing Rule 4(k)(2)). Rule 4(k)(2) establishes jurisdiction over a defendant when process has been served and three requirements are met: (1) the plaintiff's claim arises under federal law; (2) the defendant is not subject to jurisdiction in any state's court of general jurisdiction; and (3) the exercise of jurisdiction comports with due process. *Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1416 (Fed. Cir. 2009).

The first requirement of Rule 4(k)(2) is uncontested and easily resolved. Snap-On has brought suit against Beissbarth for patent infringement under the Patent Laws of the United States in its amended complaint. Pursuant to 28 U.S.C. § 1338(a), a federal district court has "original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks. . . ." 28 U.S.C. § 1338(a); *Christianson v. Colt Indus. Operating Corp.*,

486 U.S. 800, 809 (1988) (stating that U.S. district courts possess subject matter jurisdiction over civil actions that arise under any Act of Congress relating to patents).

The second requirement in the application of Rule 4(k)(2) is that the defendant must not be subject to personal jurisdiction in the courts of any state (referred to as the "negation requirement"). *Merial*, 681 F.3d at 1294. Although the plaintiff usually bears the burden of establishing personal jurisdiction under Rule 4(k)(2), that proposition would be unduly burdensome if the plaintiff were tasked with the extraordinary challenge of "proving a negative many times over." *Id*. quoting (*Touchcom*, 574 F.3d at 1413). The Federal Circuit has adopted the burden-shifting approach taken by the Seventh Circuit which allows a district court to use Rule 4(k)(2) if a defendant asserts that it cannot be sued in the forum state and refuses to identify any other state where suit is possible. *Touchcom,* 574 F.3d at 1413.

Beissbarth contests the second requirement and asserts that it has conceded jurisdiction in Virginia, which would negate the imposition of Rule 4(k)(2). Snap-On counters Beissbarth's assertion with the contention that Beissbarth has not timely or effectively conceded jurisdiction. The Court notes that Beissbarth contends that it cannot be sued in Illinois. As for the propriety of jurisdiction existing in another state, Beissbarth alluded to being subject to personal jurisdiction in Virginia in a footnote contained in its initial motion filed on January 16, 2012. However since its initial submission, Beissbarth has rebuffed Snap-On's efforts on four different occasions to formally concede it is subject to jurisdiction in any federal district court. Furthermore

on July 30, 2013, during a status hearing, Beissbarth plainly stated to the Court that it was not asserting Virginia as the proper jurisdictional site.

Beissbarth has engaged in the insincere dealing of playing jurisdictional hide-the-ball. On the one hand, Beissbarth has currently taken the position that it would be subject to personal jurisdiction in Virginia for the purposes of avoiding the application of Rule 4(k)(2). However, in the months leading up to disposition of the current motion and through its assertions in open court, Beissbarth has avoided conceding jurisdiction or even asserting that jurisdiction may be proper in another state. The onus is on Beissbarth to concede jurisdiction in another state, but it has repeatedly dodged attempts to solidify its jurisdictional position. The Court concludes that Beissbarth has failed to establish that it is subject to jurisdiction in another state court. *See Touchcom*, 574 F.3d at 1415 (adopting the Seventh Circuit's negation requirement of Rule 4(k)(2), the court determined that the defendant did not concede jurisdiction when its counsel was asked during oral argument if the defendant were subject to personal jurisdiction in another forum, counsel's response was non-committal and suggested more discovery would be needed).

The parties contest whether it is constitutional to exert personal jurisdiction over Beissbarth. Courts may exercise personal jurisdiction over defendants on either of two bases: general or specific jurisdiction. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846, 2851 (2011). Snap-On does not allege that Beissbarth is subject to general jurisdiction. Under general jurisdiction, the exercise of jurisdiction

is proper where the defendant has continuous and systematic contacts with the forum state, even if those contacts are not related to the cause of action. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984). Snap-On solely seeks to establish that the Court has specific jurisdiction over Beissbarth.

In evaluating Beissbarth's contacts, it is significant to note that Rule 4(k)(2) serves as a federal long-arm statute, which allows a district court to exercise personal jurisdiction over a foreign defendant whose contacts with the United States, but not with the forum state, satisfy due process. *Synthes,* 563 F.3d at 1296. Rule 4(k)(2) allows the plaintiff to aggregate a defendant's contacts with the entire nation as opposed to an individual forum state. *See id*.

Specific personal jurisdiction arises out of or relates to the cause of action, even if those contacts are isolated and sporadic. *LSI Industires Inc., v. Huddelll Lighting, Inc.*, 232 F.3d 1369, 1375 (Fed. Cir. 2000). To satisfy due process, a party must have minimum contacts with the forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l. Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945); *Commisariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.,* 395 F.3d 1315, 1320 (Fed. Cir. 2005). A court may not exercise personal jurisdiction on the basis of random, fortuitous or attenuated contacts, or due to the "unilateral activity of another party or a third person." *Helicopteros,* 466 U.S. at 417. The Federal Circuit applies a three-part test to determine if personal jurisdiction over a foreign defendant comports with due process:

(1) whether the defendant purposefully directed its activities at residents of the forum; (2) whether the claim arises out of or relates to the defendant's activities with the forum; and (3) whether the assertion of personal jurisdiction is reasonable and fair. *AFTG-TG,* 689 F.3d at 1363.

### A. Conduct Purposefully Directed to the United States

Beissbarth avers that Snap-On has failed to establish that it purposefully directed its corporation's activities to the United States. However, the evidence indicates that Beissbarth purposefully focused its energies and corporate resources to ensure that the Easy 3D wheel alignment system was successful in the United States. The record shows that with the oversight of Bosch GmbH, Beissbarth and Bosch USA worked closely to introduce the Easy 3D aligner to the United States. Beissbarth participated in pricing the alignment system to accommodate Bosch USA, shipping the Easy 3D aligner, providing extensive technical and marketing support, and was involved in planning the Easy 3D product launch.

Beissbarth asks the Court to relegate our consideration of Beissbarth's individual contacts with the United States, to the exclusion of Beissbarth's interactions with Bosch USA. Beissbarth relies on the declaration of Kempin who states that Beissbarth is a separate and distinct company which is independent from Bosch USA. Kempin emphasizes Beissbarth's Munich, Germany location and isolation from the dealings of Bosch USA in the United States. Beissbarth cannot hide behind its geographic location to obscure its interaction with Bosch USA. The

considerable amount of interplay between the companies does not suggest two independent entities. The record suggests a substantial synergy between Beissbarth and Bosch USA which was developed over the course of the Easy 3D product testing and debut. All corporate formalities between the two companies were ignored for the purpose of both companies collectively working together to accomplish their shared goal, the successful release of the Easy 3D alignment system in the United States.

Beissbarth has represented that the negotiation and purchase of the Easy 3D aligner by Bosch USA was done at arm's length. The evidence contradicts Beissbarth's position. The voluminous record indicates that Beissbarth played a significant role in manipulating the price of the Easy 3D aligner to ensure its fiscal viability with Bosch USA. Setting an acceptable transfer price was a frequent topic of discussion between Beissbarth and Bosch USA. The multiple emails exchanged between both companies' representatives reveal that Beissbarth was not setting the price of the Easy 3D at a market price point which was determined by supply and demand. The price was artificially set at a level that afforded Bosch USA the ability to bring the Easy 3D aligner to the United States at a price that was fiscally feasible. Beissbarth's sacrifice of its own profits for the sake of maximizing the profits of the expansive Bosch family of companies does not suggest an arm's length transaction.

Beissbarth asserts that it had no role in shipping the Easy 3D aligner to the United States. Beissbarth fortifies its argument with the declaration of Kempin who states that the shipment of the Easy 3D alignment system was solely the responsibility

of Bosch USA, after the purchase had been consummated in Munich, Germany. The record supports a different conclusion. Bosch GmbH's internal time lines for the product launch of the Easy 3D in the United States show that Beissbarth had some oversight in the shipment of the alignment system to the United States. Furthermore representatives from Bosch USA often inquired about the status of shipments sent from Beissbarth's Munich facility to Bosch USA's Ashland, Virginia testing facility, imputing some degree of support and knowledge. The record shows that in June 2009, as the Easy 3D was nearing its launch, Beissbarth changed the shipping procedures and began allowing Bosch USA to purchase directly from Beissbarth's factory. Beissbarth would then generate an invoice for the alignment system which reflected Bosch USA's corporate mailing address in Carol Stream, Illinois as the paying entity.

The collective efforts of Bosch USA and Beissbarth to ensure the successful launch of the Easy 3D are evident in the product and technical support provided by Beissbarth. Beissbarth technicians frequently exchanged emails and phone calls with Bosch USA representatives in Virginia in an effort to remedy technical issues that were occurring with the Easy 3D. Beissbarth technicians traveled to Ashland, Virginia to work "side by side" with the Bosch USA team to fix reoccurring problems with the Easy 3D's performance. In September 2009, as the launch of the Easy 3D wheel aligner approached, Beissbarth technicians assisted in remedying technical

difficulties which were occurring at the Easy 3D testing location in Arlington Heights, Illinois.

In addition to the technical assistance Beissbarth provided Bosch USA, it is apparent that Beissbarth was intimately involved with the launch of the Easy 3D in the United States. Beissbarth assisted in the translation of materials from German to English, tailored its warranty on the Easy 3D to make it suitable for the United States market and collaborated with Bosch USA to implement an effective marketing strategy. Beissbarth corporate executives traveled to Bosch USA facilities in Ashland, Virginia to attend a meeting weeks before the launch of the Easy 3D aligner. The three day meeting involved the launch of the Easy 3D aligner and addressed a variety of issues ranging from warranty programs and spare part replacement to pricing structure.

The ardent assistance and interaction between Bosch USA and Beissbarth indicates that both entities were collectively working to achieve the success of the Easy 3D wheel alignment system in the United States. We conclude that Beissbarth's concerted efforts purposefully directed its activities at residents of the United States and thus had "minimum contacts" to satisfy due process.

**B. Claims arise out of Bosch GmbH's activities in the United States**

The second factor in the due process analysis requires the Court to determine if Snap-On's claims have arisen out of Beissbarth's conduct in the United States. Snap-On alleges that Beissbarth infringed on its allegedly valid patent by making, using,

and offering to sell the Easy 3D wheel alignment system in the United States. Based on the evidence Snap-On's claims "arise out of" and "relate to" Beissbarth's activities in the United States. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985).

**C. Exercising Jurisdiction would be Reasonable and Fair**

Beissbarth argues that its limited contacts with Illinois and the United States are too attenuated to give them fair warning that it could be subject to the jurisdiction of this forum. In determining whether exercising jurisdiction comports with fair play and substantial justice, the Court considers five factors: "(1) the burden on the defendant, (2) the forum's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the states in furthering fundamental substantive policies." *Burger King,* 471 U.S. at 477.

Beissbarth will surely face a burden in subjecting itself to a foreign nation's judicial system and travelling from Germany. However, the "progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome." *Synthes*, 563 F.3d at 1299 (quoting *World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 294 (1980)). In the course of the Easy 3D product roll out in the United States in 2009 Beissbarth's representatives travelled to the United States on three occasions. The record indicates that Beissbarth

employees arrived in the United States without extended planning when problems arose with the testing of the Easy 3D aligner in Virginia.  In light of the frequency and relative ease with which Beissbarth's representatives traveled to the United States the Court deems Beissbarth's travel requirements as not unduly burdensome.

Additionally the burden of travel which must be borne by Beissbarth is outweighed by the interest of the United States in adjudicating Snap-On's dispute and obtaining convenient relief of its claims, as contemplated by the second and third considerations of the due process analysis. *See Synthes*, 563 F.3d at 1299.  The United States has a strong interest in enforcing its federal patent laws. *Id*.  The United States also has an interest in discouraging injuries that occur within its boundaries, including injuries resulting from patent infringement. *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1568 (Fed. Cir. 1994).  Although Snap-On could have sued Beissbarth in Germany, a suit brought in Germany in conjunction with the case at bar involving Beissbarth's parent company, Bosch GmbH and its sister entity Bosch USA, would be unduly cumbersome.  Germany does not have a substantial interest in resolving Snap-On's expansive U.S. patent infringement claims.  The United States has a strong interest in resolving patent infringement claims involving U.S. patents brought by a U.S. based company.  Beissbarth has availed itself of the laws of the United States and it would not offend traditional notions of fair play and substantial justice to require Beissbarth to defend this action.  The Court concludes that Snap-On has established that this Court may exercise personal jurisdiction over Beissbarth.

## CONCLUSION

For the foregoing reasons Beissbarth's motion to dismiss for lack of personal jurisdiction is denied.

Dated: September 26, 2013      _____
Charles P. Kocoras
United States District Judge