UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SNAP-ON INC.,

    Plaintiff,

v.

ROBERT BOSCH, LLC, ROBERT BOSCH, GMBH, and BEISSBARTH GMBH,

    Defendants.

No. 09 CV 6914

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

In 2009, when Robert Bosch, LLC introduced a competing automotive wheel alignment product in the U.S., Snap-on Inc. sued Bosch for allegedly infringing several Snap-on patents. Around two years later, Snap-on filed an amended complaint, dropping one patent and adding as defendants two German members of the global Bosch Group: Robert Bosch, GmbH (the parent company of Robert Bosch, LLC) and Beissbarth GmbH (a subsidiary of Robert Bosch, GmbH, that manufactured the allegedly infringing product). The defendants (collectively, Bosch) brought counterclaims against Snap-on for non-infringement, invalidity, declaratory judgment of unenforceability, tortious interference with prospective business advantage, and tortious interference with contract.

As time passed, the parties became mired in several motions to dismiss, discovery disputes, and fruitless settlement negotiations. Litigation expenses mounted, the case cycled through multiple judges, and some of the patents expired. The parties never reached final infringement, invalidity, and unenforceability

contentions, claim construction, or summary judgment. Around six years into the case, settlement negotiations got close to a resolution. An agreement was nearly reached, but the parties were unable to finalize terms. After this last, abortive settlement process, Snap-on provided Bosch with a covenant not to sue to eliminate any case or controversy under the Snap-on patents. Snap-on then moved to dismiss its infringement claims and Bosch's counterclaims for declarations of non-infringement, invalidity, and unenforceability. [299].[1] The patent claims were dismissed with prejudice, leaving only Bosch's counterclaims related to tortious interference. [301]. In turn, upon Bosch's unopposed motion, Bosch's remaining tortious interference counterclaims were dismissed, with each side bearing its own costs and fees in litigating those counterclaims. [343].

Bosch now moves for attorney fees on the patent-related claims. [339]. For the following reasons, Bosch's motion is denied.

I.  Analysis

   A.  **Prevailing Party**

The Patent Act gives courts the discretion to award the "prevailing party" reasonable attorney fees in "exceptional cases." 35 U.S.C. § 285. "A party 'prevails' when 'actual relief on the merits of [its] claim materially alters the legal relationship between the parties . . . in a way that directly benefits the [party].'" *SSL Servs., LLC v. Citrix Sys., Inc.*, 769 F.3d 1073, 1087 (Fed. Cir. 2014) (quoting

---

[1] Bracketed numbers refer to entries on the district court's docket.

*Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992)). A party need not prevail on all claims to qualify as the prevailing party. *Id.* at 1086.

Bosch is a "prevailing party" on the patent claims. Although voluntary dismissal of a lawsuit prior to final judgment does not necessarily make the defendant a prevailing party, *Inland Steel Co. v. LTV Steel Co.*, 364 F.3d 1318, 1321 (Fed. Cir. 2004), when dismissal of a claim with prejudice "is paired with a covenant not to sue," the Federal Circuit "has held that the dismissed party must be regarded as the prevailing party." *Pragmatus Telecom LLC v. Newegg Inc.*, 625 Fed. App'x 528, 529 (Fed. Cir. 2015) (citing *Highway Equip. Co. v. FECO, Ltd.*, 469 F.3d 1027, 1035 (Fed. Cir. 2006)). Snap-on granted Bosch a comprehensive covenant not to sue and then requested dismissal of its claims and Bosch's counterclaims (with prejudice) pursuant to that covenant. This resulted in a material alteration in the legal relationship between the parties in a manner benefiting Bosch. *See, e.g., SSL Servs.*, 769 F.3d at 1087. Therefore, Bosch is the prevailing party on the patent infringement claims and patent-based counterclaims.

### B. Exceptional Case

To be entitled to attorney fees, however, it is not enough for Bosch to be a prevailing party, as "fee awards are not to be used 'as a penalty for failure to win a patent infringement suit.'" *Gaymar Indus., Inc. v. Cincinnati Sub-Zero Prods., Inc.*, 790 F.3d 1369, 1373 (Fed. Cir. 2015) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S.Ct. 1749, 1753 (2014)). Rather, Bosch must show by a preponderance of the evidence that this case was "exceptional," meaning that it is "simply one that stands out from others with respect to the substantive strength of

a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness*, 134 S.Ct. at 1756, 1758.

District courts "determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* at 1756. Relevant factors include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence," but there is "no precise rule or formula for making these determinations." *Id.* at 1756, 1756 n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534, 534 n.19 (1994)). Also, "the conduct of the parties is a relevant factor under *Octane*'s totality-of-the-circumstances inquiry, including the conduct of the movant." *Gaymar Indus.,* 790 F.3d at 1373.

Bosch has not established by a preponderance of the evidence that this is an "exceptional" case entitling Bosch to attorneys' fees. Bosch argues for fees based on the purportedly unreasonable manner in which Snap-on litigated this case and the weakness of Snap-on's claims; but despite the age of this case, the record on the substantive merits is undeveloped, and as such, does not paint a persuasive picture for awarding fees.

### 1. Pre-Suit Investigation

Bosch finds fault with Snap-on's pre-suit investigation, arguing that Snap-on's counsel were not patent specialists, were not competent to evaluate infringement, and did not test the Bosch aligner themselves but instead improperly

4

relied on a Snap-on engineer's inexpert and incomplete analysis of Bosch's product. In Bosch's view, an adequate pre-suit investigation would have informed Snap-on that Bosch's aligner product did not infringe. An inadequate pre-suit investigation and the subsequent filing of a baseless infringement action are factors that may provide grounds for a finding of exceptionality. *See Lumen View Tech. LLC v. Findthebest.com, Inc.*, 811 F.3d 479, 483 (Fed. Cir. 2016). "[T]he key factor in determining whether a patentee performed a reasonable pre-filing inquiry is the presence of an infringement analysis," *Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1302 (Fed. Cir. 2004) (citing *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 986 (Fed. Cir. 2000)), which "can simply consist of a good faith, informed comparison of the claims of a patent against the accused subject matter." *Id*. Snap-on zealously defends the qualifications of its counsel and engineer, but only vaguely outlines the steps taken prior to filing suit. Nevertheless, Snap-on's pre-suit investigation was reasonable.

As an initial matter, Bosch's attack on the qualifications of Snap-on's counsel to litigate a patent case is not persuasive. Attorneys are not required to have technical degrees to litigate patent matters. Snap-on's counsel litigated prior cases involving several of the asserted patents in this case, and therefore had prior familiarity with those patents. If anything, Bosch's condescension toward opposing counsel suggests a lack of professionalism on the part of the defense.

Going to the merits of Snap-on's pre-suit investigation, this is not type of "exceptional" case where the patentee failed to obtain or analyze the accused

5

product. *See, e.g., Judin v. United States*, 110 F.3d 780, 784 (Fed. Cir. 1997) (plaintiff sued without seeking access to examine allegedly infringing devices). Prior to the lawsuit, Snap-on sent its lead engineer, David Jackson, to Germany in order to analyze the accused Bosch product. Jackson has been involved in research and development of wheel-aligner products for over twenty years and was the named inventor on two of the asserted patents, as well as the named inventor on several non-asserted patents. He spent several days analyzing Bosch's product and wrote a twenty-five page report detailing his understanding of the Bosch product. At the end of the report, Jackson listed six Snap-on patents that he believed were being infringed—these were the same six patents on which Snap-on eventually sued Bosch for infringement. Bosch characterizes Jackson's report as incomplete because he did not address the patents or infringement in detail but instead focused on how Bosch's product was designed and how it functioned. But the report was not the only material relied upon by counsel. Neither was the report so clearly inexpert, as Bosch claims, because Jackson was a mechanical engineer and not a software or electrical engineer. Bosch has made not made a sufficient showing that a software or electrical engineering background was a prerequisite to understanding Bosch's product, and Jackson's education and extensive experience in this industry indicate that he was qualified to analyze a competing wheel aligner product.

This also does not appear to be the type of case, as Bosch asserts, where counsel blindly relied on the unsupported and inexpert infringement analysis of a lay client. *See, e.g., S. Bravo Sys., Inc. v. Containment Techs. Corp.*, 96 F.3d 1372,

6

1375 (Fed. Cir. 1996). In collaboration with Snap-on's counsel, Jackson prepared claim charts comparing the patent claims to Bosch's product.[2] Consultation with the patentee during the pre-filing investigation is "prudent, highly desirable, and the usual practice." *Orenshteyn v. Citrix Sys., Inc.*, 341 Fed. App'x 621, 627 (Fed. Cir. 2009). In a declaration, Snap-on's counsel states that, prior to filing the lawsuit, she "examined the claim language of each of the patents Bosch was asserted to infringe and applied it to the Bosch product as described by the Snap-on engineers, including Mr. Jackson" to determine that Snap-on had a good faith basis for asserting infringement "of at least one claim of each of the patents at issue." [355-9] ¶ 9. But this declaration does not demonstrate "exactly why [Snap-on] believed before filing the claim that it had a reasonable chance of proving infringement." *Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1302 (Fed. Cir. 2014) (quoting *View Eng'g*, 208 F.3d at 986). While the burden of proof is on Bosch to show exceptionality, Snap-on cannot rest on its laurels with conclusory assertions that its pre-suit filing was adequate.

That said, other evidence in the record lends credence to the assertion by Snap-on's counsel. Snap-on's counsel had experience representing Snap-on in prior

---

[2] Bosch argues that even though Snap-on's counsel's affidavit states that counsel extensively reviewed and revised the claim charts, this contradicts Jackson's deposition when he states that he "prepared" the claim charts. When read in context, however, Jackson's deposition testimony does not preclude collaboration with Snap-on's counsel and some of his answers tend to imply that he did not work on the charts alone. Also, only three claim charts were sent to Bosch in connection with Snap-on's pre-suit cease and desist letter, and Bosch claims these are the only three claim charts that were created by Snap-on. The affidavit of Snap-on's counsel is, unfortunately, silent on this issue, but Jackson's deposition testimony indicates that six claim charts had been prepared.

7

patent litigation, including matters involving some of the same patents at issue in this case. In considering whether to file suit, counsel reviewed Jackson's report (which, while not analyzing infringement, provided an in-depth analysis of Bosch's product) and had discussions with Jackson and other Snap-on engineers. Counsel also worked with Jackson to prepare claim charts. Snap-on's pre-suit inquiry, while not perfect, was reasonable.

### 2. Substantive Strength of the Claims

Bosch offers several arguments based on the idea that Snap-on acted unreasonably in pursuing invalid or exceptionally weak claims. Bosch seems to assume that its arguments on invalidity, unenforceability, and infringement now must be correct because Bosch "prevailed" in the case by obtaining a covenant not to sue and dismissal of Snap-on's claims with prejudice. But there is no evidence in the record that Snap-on threw in the towel (after settlement repeatedly failed) for any other reason than to avoid continuing to litigate a case that would result in a Pyrrhic victory, at best, due to the time and money the parties had already spent. This case ended without findings on claim scope, validity, or infringement, or even final contentions from the parties. Under these circumstances, Bosch's assertions about the relative strength of its invalidity and non-infringement arguments (and the weakness of Snap-on's infringement claims) are not persuasive. For example, the parties continue to dispute whether Bosch's aligner includes the "image processing circuitry" claimed in one of the asserted patents. Bosch insists that it does not, and therefore Snap-on should have realized that Bosch's product did not infringe. But the record Bosch has assembled is inconclusive, and the issue was

never litigated on the merits. Snap-on's infringement claims were not exceptionally weak or invalid.

### 3. Inequitable Conduct

Also unpersuasive is Bosch's argument that one of the patents was obtained by inequitable conduct—specifically, U.S. Patent No. 5,208,646, which Snap-on dropped from its amended complaint in 2011. A court can make inequitable conduct findings in considering a motion for attorney fees under § 285. *Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*, 607 F.3d 817, 827 (Fed. Cir. 2010). Proof of inequitable conduct can weigh heavily in favor of an award of attorney fees, *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1289 (Fed. Cir. 2011) ("[P]revailing on a claim of inequitable conduct often makes a case 'exceptional.'"), but inequitable conduct does not automatically render a case exceptional. *Nilssen v. Osram Sylvania, Inc.*, 528 F.3d 1352, 1358 (Fed. Cir. 2008) ("[T]here is no per se rule of exceptionality in cases involving inequitable conduct."). Assuming that the preponderance standard applicable to § 285 attorney fee motions applies (ordinarily, the clear and convincing standard applies to an inequitable conduct defense to patent enforceability), Bosch has not proven inequitable conduct.

A party raising the defense of inequitable conduct must prove "that the patent applicant (1) misrepresented or omitted information material to patentability, and (2) did so with specific intent to mislead or deceive the PTO." *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 768 F.3d 1185, 1188–89 (Fed. Cir. 2014). The '646 patent was obtained by FMC Corporation in 1993 and acquired by Snap-on three years later, when it acquired FMC's assets. Bosch argues that a non-disclosed

9

brochure on an FMC aligner (the FMC Visualiner II) invalidated the '646 patent by anticipating its "graphics array." Bosch's cited support, however, fails to establish inequitable conduct. Assuming, without the benefit of claim construction, that the FMC Visualiner II brochure was material to patentability because it might have anticipated the '646 patent "graphics array" display, "[p]roving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive." *Therasense*, 649 F.3d at 1290. Bosch argues that the only reasonable inference to be drawn from the existence of the brochure and its non-disclosure was that the brochure was intentionally withheld in the '646 patent prosecution to deceive the PTO. But knowledge of a material reference (if the brochure was material) and failure to inform the PTO is not enough to show that the patentee "made a deliberate decision to withhold it." *Id. See 1st Media, LLC v. Elec. Arts, Inc.*, 694 F.3d 1367, 1372–73 (Fed. Cir. 2012) ("A court can no longer infer intent to deceive from non-disclosure of a reference solely because that reference was known and material.").

This scanty record is insufficient proof to establish that a material misrepresentation (or omission) was made with specific intent to deceive the PTO, even by a preponderance of the evidence standard. *See 1st Media, LLC*, 694 F.3d at 1372 ("A failure of proof on any element precludes a finding of inequitable conduct.") (citing *Therasense*, 649 F.3d at 1290). Bosch's request to re-open expedited discovery on this issue is denied. *See, e.g., Forcillo v. Lemond Fitness, Inc.*, 168 Fed. App'x 429, 431 (Fed. Cir. 2006) ("[T]he district court justifiably declined to have a bench

trial on the issue of inequitable conduct after the complaint had been voluntarily dismissed with prejudice and judgment had already been entered."). In this case, inequitable conduct is but one factor to consider, and is not dispositive. The other circumstances in this case weigh against awarding fees under § 285, and it would be a waste of resources to engage in more litigation on an issue that would not materially alter the balance.

### 4. German Bosch Defendants

Bosch maintains that Snap-on unnecessarily added the German Bosch entities as defendants—Robert Bosch, GmbH, and Beissbarth GmbH—to harass Bosch and to drive up fees by entangling the parties in motion practices and jurisdictional discovery. Snap-on's position was that these Bosch entities were working together to introduce the allegedly infringing product into the U.S. market and therefore were necessary parties to ensure a full judgment. Also, because Bosch LLC took the position that it had no control over the documents of its related German companies, Snap-on believed that discovery from the German entities was necessary to obtain documents relating to the design and operation of the allegedly infringing product.

Bosch argued then (and argues now) that Bosch LLC is a multi-billion dollar company that could have satisfied any conceivable damages award and that injunctive relief would have been equally effective if issued only as against Bosch LLC. But the court was sufficiently persuaded by Snap-on's arguments to permit Snap-on to file an amended complaint adding the German Bosch entities as

defendants. [89]. Under these circumstances, the addition of the German entities as defendants was not unreasonable.

And while the addition of the German Bosch entities was heavily litigated by the parties, Bosch instigated most of the motion practice at that time.[3] Bosch opposed the amended complaint—with arguments characterized by the court as "lack[ing] merit" and "unsupported" ([89] at 3, 5)—and then moved to reconsider the court's opinion. The German entities also filed two motions for a protective order regarding jurisdictional discovery, two motions to dismiss the amended complaint based on lack of jurisdiction (which were ultimately unsuccessful), and a motion for interlocutory appeal of the denial of Bosch GmbH's motion to dismiss. In turn, Snap-on sought more jurisdictional discovery than necessary and was eventually limited by the court. But the jurisdictional discovery was not pointless—the court determined that personal jurisdiction existed over both German companies, largely because of Bosch LLC and Beissbarth's collective work to achieve the success of their wheel alignment system in the United States, and given Bosch GmbH's close supervision of its subsidiaries. [231]; [261].[4]

---

[3] Bosch also prolonged matters by refusing to accept service of the amended complaint on behalf of the German entities (even though the Bosch entities shared counsel), which required Snap-on to seek service of process under the Hague Convention and caused several weeks of delay. [132] at 2. *See, e.g.,* [89] at 3 (suggesting the German entities could avoid delay by accepting service).

[4] It is worth noting that the court's opinion also called out Beissbarth for "engag[ing] in the insincere dealing of playing jurisdictional hide-the-ball" and "repeatedly dodg[ing] attempts to solidify its jurisdictional position." [261] at 12.

As far as the German entities are concerned, Snap-on sought more jurisdictional discovery than was strictly necessary and could have made different litigation choices. But Snap-on's decision to add the German entities and seek jurisdictional discovery was not so clearly unreasonable as to make this case exceptional. *See, e.g., Site Update Sols., LLC v. CBS Corp.*, No. 2015-1448, 2016 WL 380119, at *2 (Fed. Cir. Feb. 1, 2016) (losing party's "tactical blunders and mistakes" did not warrant fees); *Gaymar Indus.*, 790 F.3d at 1377 ("sloppiness" or "bad lawyering" is "unfortunately all too common" but "does not amount to misrepresentation or misconduct"). There is even less reason to find exceptionality when Bosch's tactics prolonged resolution of these issues.

**5. Motivation and Recovery**

Another indicator of exceptionality, Bosch argues, is that Snap-on pursued its infringement claims despite minimal sales of Bosch's product—purportedly in an attempt to drive up fees and force Bosch into a settlement for a non-exclusive license. At the beginning of this case, Snap-on attempted to secure a temporary restraining order to prevent Bosch from presenting its alignment product at a trade show. Bosch argues that Snap-on's decision to engage in litigation and seek a TRO was unreasonable, especially considering Bosch's offer to engage in informal discussions. The court found that a temporary restraining order was not appropriate under the circumstances, mainly because Bosch's product had already been shown at the trade show, which was nearly over. During the hearing, however, the court reflected on the parties' actions leading up to the trade show and TRO motion, stating that both parties had been "jockeying" and "jousting" for advantage

13

but that Bosch had engaged in "delaying tactics," "gamesmanship," and a "lack of direct candor" by telling Snap-on that Bosch had not yet determined whether it would show the product when Bosch had very likely already made preparations to do so. [355-2] at 11–19. Snap-on's behavior, when considered with Bosch's conduct, was unexceptional.

Bosch contends that Snap-on also unreasonably litigated this suit despite (in Bosch's view) the minimal potential recovery. Because Snap-on admitted at the outset of its suit that the market for wheel aligners was "small and competitive"—around 6,000 units per year in North America—Bosch suggests that Snap-on should have recognized before filing suit that the costs of litigating the merits of the case would outweigh any recovery. Bosch also points to its disclosures revealing that, as of November 2010, Bosch had only sold 36 products, for a gross revenue of less than half of a million dollars. The total number of Bosch units sold for the first three years was about 45 units per year. Bosch argues that Snap-on knew that Bosch's market penetration was less than 1% but deliberately drove up fees by adding the German Bosch entities to the suit, thus embroiling the parties in years of motion practice and jurisdictional discovery. But Bosch introduced its product in 2009, when this suit began, and as Snap-on points out, relatively low initial sales were not necessarily reflective of Bosch's future market position.

As another factor weighing against Snap-on's purported motivation to drive up fees, Snap-on argues that it attempted to resolve issues with Bosch prior to filing suit and repeatedly engaged in settlement negotiations with Bosch. After those

14

settlement negotiations failed and once it became clear that litigation expenses were outweighing potential recovery, Snap-on voluntarily dismissed the case and provided Bosch with a covenant not to sue. Even if Snap-on could have chosen other litigation tactics that may have been more efficient, Snap-on's willingness to settle or otherwise resolve this lawsuit weighs against finding that Snap-on was merely attempting to harass Bosch and drive up legal fees.

The circumstances in this case differ significantly from cases finding an improper motivation—where, for example, a patentee not actually practicing a patent uses baseless litigation as a predatory strategy involving numerous suits. *See, e.g., SFA Sys., LLC v. Newegg Inc.*, 793 F.3d 1344, 1350 (Fed. Cir. 2015). Snap-on practiced the patents and was well-established in the U.S. aligner market. Although it had been involved in other lawsuits regarding some of the patents, Snap-on's lawsuits do not appear to be frivolous or part of an overall a predatory strategy.

### 6. Totality of the Circumstances

Considering the totality of the circumstances, this case does not stand out. A party's position on issues of law ultimately need not be correct, *SFA Systems*, 793 F.3d at 1348, and here, the strengths or weaknesses of Snap-on's legal theories remain too speculative to warrant fees. Evidence of meritless claims must be reasonably clear without requiring a "mini-trial" on the merits for attorneys' fees purposes, *see id.* at 1348–49, and Bosch has not made such a showing. Bosch's other complaints about Snap-on do not add up to make this an exceptional case. Bosch has not proven inequitable conduct, and Snap-on conducted a reasonable, albeit not

ideal, pre-suit investigation. The litigation tactics were inefficient, but the blame for that is shared. Bosch's own motion practice and stonewalling of Snap-on's discovery efforts equally contributed to the excessive litigation. And on occasion, Bosch's conduct lacked integrity. *See, e.g.,* [261] at 12 (insincere dealing); [355-2] at 19 (lack of candor).[5] With that in the mix, Bosch's experience with this lawsuit—time-consuming and expensive though it may have been—was unexceptional.

## II. Conclusion

Bosch's motion for attorney fees [339] is denied.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: 4/28/16

---

[5] Bosch incorrectly asserts that only the loser's conduct is examined on a § 285 motion. [340] at 10. The movant's conduct is relevant and may be considered. *Gaymar Indus.*, 790 F.3d at 1373.

16